May it please the Court, I'm David Bender. I represent the Plaintiff Appellants, WildEarth Guardians, Midwest Environmental Defense Center, and the Sierra Club. I'd like to reserve some time for rebuttal. The Plaintiffs Environmental Groups, in this case, brought suit in the District Court to seek to compel the EPA to promulgate rules to implement the Prevention of Significant Deterioration, PSD, program for the 2008 ozone standard that EPA adopted. The purpose of the PSD program is to ensure that air quality doesn't get worse up to the point of the ambient air quality standard in every case. The ambient air quality standard is supposed to serve as a floor for air quality, but Congress intended that air quality remain at better than the ambient air quality standards based on the PSD program. The problem, the real world problem here is that the PSD program as it exists now was designed based on standards that have since been replaced several times over, without the PSD program keeping pace to make sure that it's protecting the air quality at a level above the current ambient air quality standard. Do I understand correctly that this program has not yet been applied to ozone? The program has been applied to ozone, but it's been applied through rules which were designed for ozone standard that EPA has since rejected as not sufficiently stringent. And the implementing rules themselves are linked to the level of the standard and not just the pollutant ozone. There's a notation in your brief in a couple of places that I don't quite understand. And you can probably explain it for me. But on page 19, for instance, you have a chart and it lists the primary and secondary ozone point oh eight parts per million, eight hour. That's the previous standard. And then it says the next one in 2008, primary and secondary ozone point oh seven five parts per million, eight hour. And then there's note. This rulemaking did not change the 1997 point oh eight parts per million, eight hour ozone standard. It's it looks like you're showing the change in standard and then saying, well, it didn't change the standard. I believe that the primary standard change. There are multiple standards. There's a primary standard intended to protect health. And there's a secondary standard intended to protect welfare, vegetation, other environmental impacts other than or in addition to health. So what was it that was changed and what was not changed? The primary standard was changed from point zero eight to point zero seven five parts per million or seventy five parts per billion. That's the that's the most recent standard. OK. And the secondary was not changed. That's correct. And in your view, would it be sufficient if the EPA were to issue a new P.S.D. regulation saying the change in the standard for ozone under the N.A.Q.S. is not sufficient to warrant changing it. This is if they deliberately said, OK, we're looking at it. We have the prior P.S.D. The change in the underlying whatever you call it, N.A.Q.S., doesn't require a change in the P.S.D. Would that satisfy their obligation in your view? It would it would satisfy if they go through that rulemaking process and do the analysis necessary, open it to public comment. Public comments come in and then they decide based on the evidence in the record that the existing criteria protect the new standard. It satisfies their mandatory duty. You know, depending on the record, there may be a challenge. But they need. But in your view, they need to go through the process, even if in the end they don't change the P.S.D. Right. I think that's our view. I think that's also what the statute requires and what Congress intended. And that's the statute at issue. There's really one statute, one phrase that issue in this case and whether there's a mandatory duty. In a sense, this is a really simple case as I see it. The question is, what does that second sentence of Section 7476A mean? And the second sentence reads, in the case of pollutants, and the question is whether pollutants means, listen up, government, the question is whether pollutants means pollutants or whether it means additional pollutants, new pollutants, other pollutants, or whether it means simply pollutants. And then in the case of pollutants for which the National Ambient Air Quality Standards are promulgated after da, da, da, da, the question is whether promulgated includes promulgation of new standards or, in addition, promulgation of revised standards. So you've got two definitional questions. What does pollutants mean and what does promulgated mean? I think that's right, Your Honor. And I think that the plain meaning of both terms includes ozone. I mean, I don't think there's a dispute that ozone is a pollutant, and there's no dispute that the 2008 standard was promulgated after 1977. So the question is, is there a narrower interpretation than what appears on the face of the statute? Does it mean a promulgation of an act for which the pollutant was not previously regulated? That's the government's interpretation, at least in this case, although, as we point out, they've interpreted it differently in the Federal Register as recently as four years ago. The Circuit Court or, excuse me, the District Court's decision starts with recognizing that the plain language of the word promulgate is broad enough to cover both establishing a standard for a pollutant that was not previously regulated as well as establishing a new standard for a pollutant to replace or supplement a prior National Ambient Air Quality Standard. I can see one way in which you can't really read that second sentence in isolation, because it lists four pollutants in the first one and says the and there are four for which standards have been set. And the agency must, within two years, do do what you're asking them to do. And then it says in the case of pollutants for which National Ambient Air Quality Standards are promulgated after, there's a natural tendency in reading to put that as an alternative and to read into pollutants the remainder of the pollutants, you know, the ones that weren't mentioned in the first. I mean, that's one at least arguable way to read that. That, I mean, the problem with that interpretation, I guess there's multiple problems with it. One is that there are two separate sentences. Instead of having for these pollutants two years from date of enactment and for new or additional or those that follow, there are a lot of more natural ways for Congress to express that. Instead it had two separate sentences and started with broad, pollutants broadly, for which a standard is promulgated after 77. The other problem is EPA, there's another section, 163, that set some of the PSD program for particulate matter. And EPA adopted a new particulate matter NAAQS, PM 2.5, a smaller particle size. Now, that one depends on whether you consider a different size of particulate, a new standard or just a revision of the old standard. Except in the way, Your Honor, that EPA described its thinking, because industry comments, when EPA proposed this, came in saying, you know, you can't use 166A to promulgate new PSD requirements because Congress already took care of that for particulate matter. And PM 2.5 is particulate matter. And so it's already taken care of. 166A, second sentence, isn't broad enough to cover pollutants for which standards already exist. And EPA said, you know, consistent with plaintiff's position in this case, you know, no. Congress purposely did not use, in fact, they said this. Because the act refers to pollutants for which EPA promulgates NAAQS after 1977 and does not use the phrase additional pollutants, section 166A provides authority for EPA to promulgate new increments, which is one part of the PSD program, after revising an existing NAAQS, including NAAQS first promulgated before 1977. So in that statement, they said, even if PM had been regulated before 77, we've revised it more recently. And Congress's omission of narrowing terms in 166A allows us to promulgate PSD. Can I ask, what were you just reading from? Was it the final, the 2013 final rule for PM 2.5? 75 Federal Register at 64, 872. I believe that's a 2010 Federal Register. Okay. Because I'm looking at the ñ neither you nor the government mentioned the 2013 final rule for PM 2.5. And I'm sure that you're familiar with it, though. The 2013 update revised the annual standard to 12. Well, it's just, there's a statement in that final rule that I'm just wondering if we owe Chevron deference to it now. Because there the EPA clearly says that it does not interpret, I'm just going to read it to you, does not interpret section 166A of the Act to require that the EPA revise existing increments whenever the EPA revises a NAAQS. I mean, it's, it very much mirrors the position they're taking in this litigation. And even if we were to accept your position that the statute perhaps could be read either way, don't we owe Chevron deference to that, that statement? Two things, Your Honor. I don't believe that Chevron deference is owed to their interpretation of their duties first. Second, the timing is important. Our position, and as best we can tell from our review of the Federal Register notices, EPA's interpretation was consistent with ours up until this litigation. The district court decision was in 2012, which precedes the 2013 notice that you read from. And so to the extent that EPA is now taking the position following the litigation where this was briefed and argued to the district court and briefed to this court that is trying to be consistent with its now litigation position, I don't believe the court owes that new position deference. The other problems, Your Honor, with the district court's analysis is after recognizing that the word promulgate is broad enough based on dictionary definitions to include adopting standards to replace them for pollutants that already existed, the court went on to look for other sections where in the district court's view the word promulgate was juxtaposed with the word revision to identify what the court thought was Congress's intent to mean two different things. The problem is if you look at those sections, Congress, in almost all of them, wasn't juxtaposing the word promulgate and the word revision. Congress said promulgation of the preposition and then juxtaposed two other things, ambient air quality standards or revisions thereof, new standards or revisions thereto. And so to the extent that Congress was meaning to differentiate between two things in those statutes, it wasn't differentiating between promulgate and revise. Revise is a subset of. I mean, I agree with you on that point, but I just want to, in your remaining time, get your brief response to the government's reliance on the sovereign immunity canon of statutory construction. Because I guess, again, I'm looking at the statute, and I agree with you that it could be read either way, and I'm trying to figure out, well, what, you know, what tilts us one way or the other. I guess I found the government's reliance on those cases somewhat persuasive, but I'd love to hear what you have to say in response. Yeah. Your Honor, thank you. The issue is there is no question that the citizen supervision waived sovereign immunity where the government has a mandatory duty. And then the government goes into some cases where the issue was whether the duty the statute gave was mandatory or discretionary, and that depended on whether there was an act, a specific act to be taken by a date certain. I would submit that the question here isn't within that at all. The citizen supervision waived sovereign immunity for mandatory duties, and the question isn't whether there's a mandatory duty, but whether that mandatory duty that exists applies to the facts here or not, which is, I think, is one step beyond and categorically different than the cases the government relies on for its kind of request for a narrow interpretation. I'm not sure it gets you one way or the other, meaning, and I think in order to hold you away, we have to read the second sentence as meaning fairly clearly pollutants, including all pollutants. And I think that Congress used the word. Once we're done with all the fancy talk, the question is how clear is that second sentence? I think the question is which is the more reasonable interpretation of that second sentence. I agree with that. And I'm not sure I want to argue it that way, because if you say which one is the more reasonable, that suggests that both are reasonable. It may be. I mean, they both are reasonable. It's completely ambiguous. You know, the two sentences together, you could reasonably read them either way. That's why, to me, I'm looking for something that would push us one way or the other. I don't know how else to read it. I'm with Justice Scalia. Pollutants means pollutants. I read the text. I'm done. Let's hear from the government. You've got a chance to respond. That's a first. Hi, good morning. May it please the Court, Robert Weinman representing EPA. I'm going to start right with that statutory language, whether it's clear or ambiguous or not. But if it's ambiguous, if it's not clear, we, EPA, should win, because, for example, this Court's opinion in Our Children's Earth, Clean Water Act case, look at this sort of issue. Unclear Clean Water Act provisions. Plaintiff's arguments were coming from look at it this way, look at it this way, amalgamating various provisions. And the Court said you don't prevail in that circumstance. You have to have a clear duty. Certainly. I mean, you could have an ambiguous word and then have the whole context of the Act and every other section that bears on it to lead to only one meaning, even though that originally was ambiguous. Is it your position that that can never create a mandatory duty? No. I think if you had an ambiguous word, just you take a word out of its context entirely, and it could mean two different things. Right. But everything else pointed one direction. Then you have a very different case than we have here, and you could potentially have a mandatory duty. Here, though, if you look at the second sentence of 166A, you can't just look at the word pollutants. You have to look at the first sentence of 166A, which includes ozone and includes three other specified pollutants. And stepping back, you have to look at 163 as well, which includes particulate matter and sulfur oxides. And the 1990 Environmental Defense Fund case from D.C. Circuit doesn't look at the second sentence of 166A, but it says, look, there are different categories of pollutants here with respect to 163 and the first sentence of 166A. And we think that the logical next step is the second sentence of 166A is another category of pollutants. It's a category for which EPA promulgates and enacts for a new pollutant after 1977. Kennedy. But, yeah, but, you know, how much money is it going to cost the government at the printing office to add the word other pollutants? I mean, what reason did they have for leaving out the word other or new or additional? That's a facetious comment. But this one's the next one's a serious comment. If I'm trying to figure out what the statute is about, we have a notion that once you get the underlying air quality standard, the PSD requirement is supposed to play off of and in some way implement. So it makes no sense at all for the statute to say, you know, if the underlying NAC is changed, the PSD doesn't need to change, because the whole purpose of the PSD is to correspond to the NAC. So if the NACs are changed, well, the idea that the statute would say, well, if you once you've done your NAC, you're done, and you know more stuff, either scientifically or it turns out for various other reasons, all of a sudden the NAC really does need to be changed. Sorry, we've written this so that you can't possibly change the PSD. That doesn't make any practical sense as I try to understand what Congress is about. I think it does make practical sense here, because what can happen when the NACs are changed, it can have different effects on a PSD program. So it's not automatic that you revise a NAC's level. For example, here with ozone, it's reduced from .08 to .075. Now, there is no increment for ozone, and the increment is part of how the PSD program is implemented. The idea of the increment is you have a baseline pollution concentration, and we're across the country, so it's not creating one simple ceiling of pollution, but it's going to vary depending on the baseline plus the increment. And the idea that you have to always revise that idea, how much more over the baseline you can go, because the ceiling of the NACs has gone up or down a little bit, just doesn't follow. It may make sense, but that's why EPA should have discretion. But I think we got the answer to that already, which is to say merely because the you have to change the PSD, but you don't want to just say, oh, well, it's changed, and I don't even need to look at it. I mean, the government can come back and say, you know, okay, that change in the NAC doesn't really make any difference, and the PSD is just the requirements are still fine. Well, Congress could have done two things here. It could have done that. It could have said, when a NAC is revised, and put the revised word in the second sentence of 166A, EPA, you must go through a rulemaking. That would have been the mandatory duty, and then Plaintiffs would be right, there's a mandatory duty. Instead, Congress said, EPA, you have the authority to revise a NAC, and EPA has general rulemaking authority. It can revise a prevention of significant deterioration rule if it wants to. But it's not that every duty or every ---- Kagan. You say they have the authority. Where does the authority come from? You say they have the authority, but not the duty. Where does the authority come from? The authority comes from two places for ozone. It comes first from the first sentence of 166A, because it lists ozone, and it imposes a mandatory duty as of 1977 on EPA with respect to ozone. That's the first source of the duty. The second source of the duty is or the second source of the authority is that EPA has general rulemaking authority to implement the prevention of significant deterioration program under 301 of the statute. So it can go in and say, you know what makes sense now? It makes sense to do an ozone increment. And nothing is in the statute that's going to prevent EPA from doing so. Now, one of the arguments plaintiffs make is that in the particulate matter prevention of significant deterioration rulemaking, they say that that's what EPA did, that it went back and used the second sentence of 166A with respect to particulate matter of 2.5 micrometers or less. But if you look at what EPA said, that is not what it did. It said this. It's going to take this action, quote, as if PM 2.5 was a new pollutant. So it was putting, slotting PM 2.5 into the second sentence of 166A because it was considering the different size of particulate matter to be a new pollutant. And then the action is completely consistent with that because it imposed both a new increment for PM 2.5 and left the old increment in place. So it was treating PM 10 and PM 2.5 as separate pollutants. And that explains what happened in the 75 FEDREG 64871. Kennedy, can I ask you? Is there anything that we can grant Chevron deference to that the EPA has said? It just seems like the government's position has shifted over time back and forth. I'm looking for something, as I said to your opponent. Is there something you can point me to? Well, I think the shifting is not correct. Just I want to address that really briefly. EPA has never said the interpretation that plaintiffs are arguing.  We've got 30-plus years now of this statute. And there's no statement where EPA has said that. And it doesn't say it in the place that they focus on. As to Chevron deference, one more quick threshold point. We think, as this Court in All Children's Earth explained, that if the statutory duty itself is not clear, that's the end of the inquiry. And that's it. And if you actually look at the history of All Children's Earth, the panel initially on rehearing EPA said, no, you shouldn't apply Chevron. If it's not a clear mandatory duty, that's the end of it. And the panel explains Chevron doesn't apply to this mandatory duty analysis. You know, to be frank, the Fourth Circuit has applied Chevron in the Monongahela case in this exact sort of analysis. I think if you look at what EPA has said, for example, in this particulate matter regulation, if you look at what it said in the prevention of significant deterioration regulation in 2005 for nitrogen oxide, it explains that there's categories here. 163, 163A1 pollutants, and 163A2 pollutants. And that those categories are distinct, and the duties imposed on each are distinct. And I think that, if the Court wanted to apply Chevron, could look at either of those places, plus the more recent rulemaking, 2013, I think explains it too. Roberts, your position is that we never get to Chevron, because, remind me, what's the legal principle you extract from the, from that case you mentioned, our case? That if the duty is not clear, if the statute doesn't create a clear duty with respect to the language, and as Judge Kamey was pointing out, if you look at the structure of the statute, if you look at the other provisions around it, if the duty is not clear from that statutory analysis, then the case should be over. Because? Because Congress, for two reasons, the Kennecott-Copper case describes this. When Congress created this citizen supervision, it made it apply only to nondiscretionary duties in order to try to avoid too much interference with EPA's complicated technical regulation of these air pollutants. And the second reason is because we think it links up well with the sovereign immunity doctrine, that a waiver of sovereign immunity has to be clear. The scope of the waiver is construed narrowly. The Sierra Club v. Whitman case describes this, for example, with respect to the Clean Water Act. And then when you get those two just background principles in place, you then don't have a clear enough waiver here to get to a clear enough example of a fit into 166A, the second sentence, to trigger the clear mandatory duty. To elaborate a little bit on a question Judge Fletcher asked, what are the deterioration standards, the PSD standards, usually a multiple or a derivative of the ambient air quality standard? The ones that have been promulgated, I think, are typically derived and linked up to the air quality standards. Because one of the arguments that I think Judge Fletcher repeated was that if the ambient air quality standard changed, then it's natural to think that an adjustment would have to be made to the PSD program applicable to that, that pollutant. There's two points. The ones that have been promulgated are linked to the NACs, but 166C and D of the statute are what address what has to be in a prevention of significant deterioration rule, and it doesn't require that. And so there's no, and it doesn't even require an increment. There has to be something akin to an increment as what, or as protective as an increment as what subsection D provides for. So there's no reason that all going forward prevention of significant deterioration rules will have any sort of connection to the NACs that have existed to date, and so there's no reason then to create a mandatory duty that every time you have to go through this process. What would the mandate be if you lost your case? Would you have to issue regulations every time you change an air quality standard? Well, I think that's what plaintiffs are asking for, that every revision of an air quality standard triggers a mandatory duty to within two years promulgate a prevention of significant deterioration regulation for that pollutant. And we have, you know, 30-plus years now of revisions of those standards, and no one has ever said that that mandatory, that language creates a mandatory duty along those lines. Can I ask you, I'm sorry to shift you off point, but I have one question. Am I right in thinking that in a couple of months maybe EPA is going to issue new NACs for ozone? Yes. I don't know about a couple of months. There's, I believe, a proposed new NACs for ozone either, it's underway. It's underwrites every five years. Every five years, and they're working. They're talking about the 2008 NACs. So my question is, if we can't get our decision out quickly, you know, in time before the new NACs is issued, what happens to this case? Even if the plaintiffs are right, I guess a new two-year window would open. Would we still have the authority to rule in their favor? I'm just wondering what the government's position on that is. I have not thought about mootness here yet. The, you know, their complaint is based on the 2008. It's tied to that 2008 NACs. If you look at their claims, it says, here's what triggers the duty, according to plaintiffs. It's this action. Well, you can't be in violation of the duty until the two years is run. Right. And obviously if a new NACs, that's why I'm, if a new NACs were to be issued in December, let's say, presumably even if the plaintiffs were right, the two years wouldn't, obviously wouldn't have run until. Right. So it would be hard. They wouldn't have a claim over the 2013 NACs for two years. And I don't, I think there could be an argument about mootness, but I haven't looked into the court's law. Judge Watford's questions have not occurred to me. But in light of the question, it occurs to me that maybe we should look to the complaint. And I don't know whether they've sought declaratory relief in addition to injunctive relief. So it might be that the declaratory judgment, while it would not require, assuming that they were to win, it would not require preparation of a new PSD requirements with respect to the old, but would declare that with respect to the new, that you have to do it. But I've got to go back and look at the complaint and see whether it's asked for declaratory judgment. Right. And we'd have to have some sort of real world relief to get over the mootness  problem. And I think just as a practical matter, I think the step beneath it is the question would then, is it sufficiently ripe? Right. And I think as a practical matter, the proposed NACs is what's on the way now. And so there's no chance, given the complexity, the size of this, the number of thousands of comments that will come, there's no chance you're going to beat us. Well, I don't speak for you, but it's not, there's no final NACs imminent. We have a window here of time. I don't know if the pros rule will, I'm sure it will address how long you have to comment, et cetera. So there will be some guidance, but none of those things are going to happen right away. Got it. I see I'm almost out of time. I just, you know, the last point I want to make is we think those statutory provisions that distinguish between promulgate and revise really are clear and they're based on triggering event of the issuance of the NACs. And we say when Congress wanted to capture both promulgation and revision, it said use both words. Thank you. Thank you. Response? I forget how much time you left on the clock. Was there some left? Nine seconds? Listen, don't say the government never did any favors. The government hereby cedes two minutes to you. Thank you, Your Honors. At the beginning, I just want to correct something from before, and I've had a chance to look at the table in our opening brief that Your Honor was asking about. The note on not changing the 1997 standard, what that's referring to is both standards exist together. And so areas that were not a payment for the 1997 standard will still meet their areas under the 2008 standard. Similar to the 1997 standard. What changed in 2008? A new standard was promulgated, which adds to, does not replace, the 1997 standard. So there is a 1997 standard which triggers two-year, three-year, one-year deadlines, and then areas have to come into compliance with that. In addition, there is a .075 standard in 2008, which then triggers those same obligations. This goes by location, you said? They differ? Some pieces of the Clean Air Act depend on whether an area is in an attainment area or not. I'd also like to address the Our Children's Earth case. The question in that case, the duty alleged in that case, was not to promulgate new, or to review effluent limitation guidelines. I think the Court made clear that there is an obligation to review. What the plaintiffs in that case wanted is a review taking specific factors into consideration, technology changes specifically. And the question wasn't whether EPA has an obligation to act. The plaintiffs wanted the Court to order EPA to act in a specific way, to review the effluent limitation guidelines and to consider, as part of that, specific factors, including technology. But what about the government's reliance on the case for the more general legal principle, that in this context, basically, if we're in equipoise, you know, the tie kind of goes to the government on this issue? I believe that's only true if the question is whether the duty is mandatory or not. But, again, the question here isn't whether the duty is mandatory or not. It's whether the duty applies to the situation here. The duty is EPA shall promulgate within two years. And the question is, two years from the promulgation of an act, the question is, does what EPA did in 2008 qualify for that? It's not whether the duty is mandatory or discretionary. We're not asking that the Court order EPA to promulgate specific pieces in its rulemaking. Only that EPA undergo the rulemaking that the State has. Kennedy. But that's not what the duty would be. According to the statute, literally, which I think you want it to be read literally, it says you've got to promulgate regulations not more than two years after the date of promulgation. It doesn't say you have to take a look at it. It says you have to publish regulations. That's correct, Your Honor. It doesn't say what the content of the regulations is. No, that's true. So they could publish a regulation saying we intend to leave the next eight pages of the Federal Register blank.  But we've decided to leave the significant emission rate for volatile organics the same. I guess that's a regulation in a sense, maybe. I mean, after you get notes and you get comments and publication and all that. I believe that it is, and it creates a new record, and it's reviewable on that record. I'd also point out, Your Honor, is that the amended complaint does ask for declaratory relief. It's the first claim for relief. And so, you know, if EPA happens to promulgate a new ambient air quality standard, which it's notoriously behind on. It's actually doing perhaps better this time. I read the newspaper correctly. The standard, the new standard is at the OMB, but it's unclear, you know, when and if that will be issued. And we're looking for protection from the old standard at this point. Thank you.  Thank you very much. Thank you both sides for a very good argument. Wild Earth Guardians versus Mal McCarthy submitted for decision. And that completes our argument schedule for both this morning and for this week.
judges: Canby, Fletcher, Watford